# In the United States Court of Federal Claims

No. 19-253C
(Filed: March 19, 2019)
(Refiled: March 27, 2019)[1]

```
*************************************
                                    *
JULIET CONSTRUCTION, LLC,           *
                                    *
              Plaintiff,            *
                                    *
       v.                           *
                                    *
THE UNITED STATES,                  *
                                    *
              Defendant.            *
                                    *
*************************************
```

## OPINION AND ORDER

**DAMICH**, Senior Judge.

On February 14, 2019, Plaintiff, Juliet Construction, LLC ("Juliet"), filed this pre-award protest complaint for injunctive and declaratory relief with respect to the Department of Veterans Affairs ("VA"), Solicitation No. 36C4419B0014. The procurement is for construction and renovation services at the Coatesville VA Medical Center in Coatesville, PA. In its complaint, Juliet contends that the U.S. Small Business Administration's ("SBA") determination that it is not a "small" business and its subsequent removal from the VA's database of Service Disabled Veterans Owned Small Businesses ("SDVOSBs") maintained by the Center for Veterans Enterprise ("CVE"), known as the Vendor Information Pages Database ("VIP Database") is unlawful. The removal of Juliet by the CVE from the VIP Database precludes it from receiving an award under the Solicitation or any other solicitation set aside for SDVOSBs. Juliet therefore requests judgment in its favor: (a) finding the SBA's size determination arbitrary, capricious, and contrary to law; and (b) restoring Juliet to the VIP Database and in all respects reversing the SBA's adverse size determination, thereby restoring its award eligibility.

The Court adopted the litigation schedule as provided by the parties and entered its scheduling order on February 19, 2019. Pursuant to the scheduling order, the Administrative Record ("AR") was timely filed on February 27, 2019.

On March 6, 2019, Juliet filed its motion for judgment on the administrative record ("Pl.

---

[1] The parties were directed to file any redactions to this opinion by March 26, 2019. The parties did not propose any redactions to the Court's March 19, 2019 Opinion. Therefore, the Court reissues this unsealed opinion in its entirety.

Mot."). On March 13, 2019, Defendant timely filed its response to Juliet's motion for judgment on the administrative record and its cross motion for the same, arguing that: (1) SBA's Office of Hearing and Appeals' (OHA) decision was not erroneous; (2) OHA correctly declined to address whether Juliet was affiliated with its mentor; (3) Juliet has not shown that the SBA's Area Office (OA) acted in bad faith; and (4) Juliet cannot establish the requirements for injunctive relief.

Juliet filed its response on March 15, 2019.[2] This matter is now ripe for decision.

As explained below, because the Court finds that the OHA properly upheld the application of the adverse inference rule to find Juliet "other-than-small" the Court **DENIES** Juliet's motion for judgment on the administrative record and **GRANTS** Defendant's cross motion for judgment on the administrative record. Accordingly, Juliet's request for injunctive and declaratory relief is denied as moot.

## I. BACKGROUND AND FACTS

### A. SBA's All Small Mentor-Protégé Program

SBA's All Small Mentor-Protégé Program (ASMPP) was established in 2016 to help small companies compete for government contracts through mentor-provided business development assistance. 13 C.F.R. § 125.9. To qualify as a protégé under the ASMPP, a business must "qualify as small for the size standard corresponding to its primary NAICS[3] code." 13 C.F.R. § 125.9(c). The protégé must seek a mentor with expertise in a primary NAICS code in which it is pursuing business and must submit various reports to SBA regarding the benefits it received from the mentor-protégé relationship. 13 C.F.R. §§ 125.9(c) & (g).

Mentors may assist the protégé by providing "technical and/or management assistance; financial assistance in the form of equity investments and/or loans; subcontracts; trade education; and/or assistance in performing prime contracts with the Government." 13 C.F.R. § 125.9(a). Once accepted into the ASMPP, an approved joint venture may compete for Federal contracts based on the protégé's size and status. 13 C.F.R. § 125.9(d).

If a mentor and protégé are found to be affiliated, the protégé may be considered "other-than-small" and therefore ineligible for certain federal contracts. *See* 13 C.F.R. §§ 121.101–121.103, 125.8–125.9.

---

[2] The Court did not believe that any additional briefing was necessary and, therefore, filed this opinion before the Government submitted its reply brief.

[3] A North American Industry Classification System (NAICS) code is the standard used by Federal statistical agencies in classifying business establishments for the purpose of collecting, analyzing, and publishing statistical data related to the United States business economy. *See* 13 C.F.R. § 121.101.

### B. Chad Suitonu Forms Juliet and Applies to SBA's ASMPP

On October 19, 2016, Chad Suitonu ("Mr. Suitonu") formed Juliet as a business concern in the State of Texas, with Mr. Suitonu serving as Juliet's sole owner and employee. AR81, AR83, AR93. Prior to forming Juliet and until February 12, 2019, Mr. Suitonu also served as Vice President of Development & Construction for PMRG Associates II, LP (PMRG Associates II), a subsidiary of the PM Realty Group.[4] *See* Compl., Ex. 3 (Mr. Suitonu's Resignation Letter).

In March 2017, Mr. Suitonu, on behalf of Juliet, applied to the SBA's All Small Mentor-Protégé Program (ASMPP), seeking to enter Juliet into a mentor/protégé relationship with PMRG Associates II. AR71–80. Juliet submitted its application under primary NAICS code 531120 (Lessors of Non-Residential Buildings (except miniwarehouses)), which has a corresponding size standard of $27.5 million in annual receipts. *Id.* at AR72.

As part of the ASMPP application, Juliet submitted its business plan to the SBA. *See id.* at AR73, AR84–92. Juliet's business plan stated, *inter alia*, that Juliet would pursue contracts from the federal government as well as from "state, city and higher education organizations that would give favorable treatment for the award of contracts to SDVOSBs, minority owned, and/or HUBZone businesses." AR85. The business plan also provided that "Key to the startup and long term viability of [Juliet] will be the mentor-protégé relationship the company plans on entering into with PM Realty Group," and that PM Realty Group would "cover salaries and all other pursuit costs" associated with any Juliet/PM Realty Group joint venture. AR86, 91.

In addition, Juliet submitted a Mentor/Protégé Agreement between Juliet and PM Associates II, which was signed March 3, 2017. *See* AR74, AR101–107. In this agreement, Juliet stated, *inter alia*, that Juliet was a minority owned, HUBZone, and SDVOSB company, and that PM Associates II would cover any "salary, legal and miscellaneous costs associated with pursuing real estate development projects." AR101–103.

On April 4, 2017, the SBA approved Juliet's ASMPP application.[5] AR98–99. Thereafter, Juliet formed two joint ventures: one with PMRG Associates II, and one with Hamstra Builders, Inc. *See* AR108–161; AR 162–217. Thereafter, Juliet and PMRG Associates II amended their mentor-protégé agreement, and on September 13, 2017, Juliet submitted the amended mentor-protégé agreement to the SBA. AR314–18.

---

[4] As explained in detail below, it is unclear whether Mr. Suitonu was employed by PMRG Associates II or the PM Realty Group, as the Complaint and administrative record show contradictory statements made by Mr. Suitonu and his counsel about Mr. Suitonu's employment with these entities.

[5] It is unclear whether the SBA noticed the discrepancy between Juliet's business plan, which stated that PM Realty Group would serve as the mentor and provide financial assistance, and Juliet's Mentor/Protégé Agreement, which stated that PMRG Associates II would serve as the mentor and provide financial assistance.

### C. Juliet and PMRG Associate II's ASMPP Evaluations Trigger a Formal Size Protest

On March 3, 2018, Juliet and PMRG Associates II submitted ASMPP Annual Evaluation Reports. AR225–233; AR234–238. After review, the SBA ASMPP found that "There appears to be affiliation between [Juliet] and [PMRG Associates II] given Mr. Suitonu is an executive of the [PMRG Associates II]. *See* AR5–7. In addition, the SBA ASMPP found that Juliet was not a HUBZone certified entity, noted issues with the joint ventures Juliet formed, and determined that Mr. Suitonu had submitted the ASMPP Annual Evaluation Reports for Mentors that PMRG Associates II was required to submit. AR6–8.

On July 17, 2018, the SBA, through the ASMPP Director, requested that the Area Office (AO) perform a formal size determination of Juliet, pursuant to 13 CFR § 121.1009. Compl. at 8, AR39–40. In this making this request, the ASMPP Director explained that "[b]ased on the information presented in the annual evaluation submission, we believe [Juliet] may be affiliated with its mentor based on [the newly organized concern rule, 13 C.F.R. § 121.103(g), and], thus, other than small for its primary [NAICS] code." AR40. The Director also noted that, based on publicly-available information, Mr. Suitonu is an employee and Vice President of PMRG Associates II. *Id.*

On July 18, 2018, AO notified Juliet of the formal size determination and requested: (1) a response to the allegations in the protest; (2) copies of organizational documents; (3) completed SBA Form 355; (4) information regarding Mr. Suitonu's employment at PMRG Associates II, including the identity of the owners, officers, and directors of PMRG Associates II; (5) an explanation of any assistance by PMRG Associates II provided to Mr. Suitonu or Juliet in the establishment of Juliet; (6) a listing of any joint venture entities that PMRG Associates II or Juliet have created and a copy of the joint venture agreements; (7) a listing of any joint venture entities that Juliet has created with entities other than PMRG Associates II and copies of those joint venture agreements; (8) a listing of the solicitation numbers for any federal or commercial contracts that the joint ventures have submitted an offer for and the status of those offers; (9) a list of contracts that Juliet was awarded in 2017 and PMRG Associates II's involvement in any of those awards; (10) a copy of the ASMPP initial approval document from SBA; (11) federal tax returns for 2016, 2017 and revenue earned in 2018 (through March 2, 2018) for Juliet and all joint ventures for which it is a joint venture partner; and (12) an indication of whether PMRG Associates II is a small business for the $27.5 million size standard. AR59–60.

The AO's July 18, 2018 letter to Juliet stated twice, in conspicuous font, that the requested information and documents "must be received by the SBA within three working days after email delivery of this letter." AR 59–60.

### D. Juliet Responds to the SBA Size Protest

On July 27, 2018, ten days after the AO's letter, Juliet submitted its response. AR61–70.

4

Juliet stated that Mr. Suitonu was and is employed by PM Realty Group, the general partner and majority owner of Juliet's mentor, PMRG Associates II. AR62–63. Juliet explained that it had not yet generated sufficient revenues to enable Mr. Suitonu to work exclusively for Juliet, so he "must still work for an employer to financially support his family." AR63.

Juliet also denied that it is affiliated with PMRG Associates II or PM Realty Group, stating that "Mr. Suitonu is not an officer, director, principal stock holder, or managing member of PM Realty or PMRG Associates [II]," and "is also not a key employee" of either organization. AR66. Juliet maintained that Mr. Suitonu is "not even a member of management" of either PM Realty Group or PMRG Associates II, but instead is responsible for "overseeing and managing the development of commercial real estate facilities, with a focus on medical properties." AR66–67.

Accompanying its protest response, Juliet also submitted its sworn SBA Form 355, which Mr. Suitonu certified as "true and correct." AR218–224. On this form, Juliet indicated that Mr. Suitonu was Juliet's sole owner, officer, and employee, but, in response to Question 9b, failed to identify Mr. Suitonu as being employed by either PMRG Associates II or PM Realty Group. *Id.* at 221. Juliet similarly responded "No" in response to the question "Have any owners, officers, directors, key employees or supervisors of [the] business ever been employed by or performed similar work for any of the alleged, acknowledged or possible affiliates?" *Id.* at 224. In addition, Juliet responded "No" to the question of whether Juliet "share[s] . . . personnel with any of the alleged, or acknowledged affiliates?" *Id.*

Thereafter, the AO requested additional information and documents from Juliet. AR325–28, AR331–35, AR336–38. In response, Juliet stated, *inter alia*, that Mr. Suitonu had "never worked" at PM Realty Group, and that he "remains an employee of PMRG Associates II." AR 326. This response further explained that Mr. Suitonu's responsibilities and duties at PMRG Associates II include "manag[ing] the construction and development of medical facilities" and "establishing overall project budgets; deriving tenant rents; negotiating leases, developing agreements, and other supporting contracts; negotiating land purchase contracts; overseeing design and construction; and managing building turn-over to tenants." AR 327. Juliet also provided Mr. Suitonu's W-2 Forms, and a chart with the corporate structure of PMRG Associates II, which listed Mr. Suitonu as a Vice President. AR333 (PMRG Associates II corporate structure); AR340–41(W-2 Forms).

### E. The AO's Formal Size Determination

On September 11, 2018, the AO issued its size determination, finding that Juliet was "other than small" based on the SBA's adverse inference rule, 13 C.F.R. § 121.1008(d). AR343, AR 346–47. The SBA's adverse inference rule provides:

> If a concern whose size status is at issue fails to submit a completed SBA Form 355, responses to the allegations of the protest, or other requested information within the time allowed by SBA, or if it submits incomplete information, SBA may presume that disclosure of the information required by the form or other missing information would demonstrate that the concern is other than a small business.

13 C.F.R. § 121.1008(d).

In this regard, the AO found that "Juliet submitted multiple material misrepresentations on the SBA Form 355 . . . [which] are part of a pattern of material misrepresentations by Juliet to SBA that began in 2017 with Juliet's ASMPP application." AR347. The AO stated that "Based on the multi-year series of misrepresentations that Juliet has submitted to SBA, the veracity of any information that Juliet has submitted to SBA is in question." AR 347. The AO found that "Juliet's Form 355—which Mr. Suitonu certified as 'true and correct'—includes no fewer than three material misrepresentations that SBA has verified." AR348.

Specifically, the AO found that Juliet did not disclose that Mr. Suitonu was an employee of either PMRG Associates II or PM Realty Group in response to question 9b, which asked whether Juliet's owner is an "owner, partner, director, officer, member, employee or principal stockholder in another business." AR348. The SBA confirmed that Mr. Suitonu was a Vice President of PMRG Associates II through his W-2 forms. *Id.*

The AO found that Juliet also failed to disclose in question 9b that Mr. Suitonu was a partner in at least three investment firms listed on Mr. Suitonu's 2017 tax return: PMRG Mesa, LLC; PMRG Surprise, LLC; and PMRose I, LLC. AR 348. In addition, "because Juliet omitted material information from question 9b, Juliet also omitted material information from questions 13a, 13b, 13c, 13d, 14a, and 14b," which request information about affiliates identified in question 9b. AR 348.

The AO found that Juliet submitted a material misrepresentation by answering "No" in response to question 15, which asks whether any owners have been "employed by or performed similar work for any of the alleged, acknowledged or possible affiliates?" AR348. The AO confirmed that "Mr. Suitonu is the sole owner of Juliet, and Mr. Suitonu is currently an employee of the mentor (or the mentor's parent) . . . whose primary focus is specifically on Healthcare." AR348. Because Juliet's principal business is real estate development services, with a focus on healthcare facilities," the AO determined that it was a misrepresentation to answer "No" to this question. *Id.* In answering "No" to this question, the AO explained that "Juliet avoided the scrutiny of a separate explanation." *Id.*

The AO also determined that Juliet's response of "No" to question 17 was a material misrepresentation. *Id.* at AR348–49. This question asks whether Juliet shared any "facilities, equipment, or personnel" with any of the alleged, or acknowledged affiliates. AR348–49. Because Mr. Suitonu was an employee of both Juliet and PMRG Associates II, the AO found

that Juliet's response was a material misrepresentation and thereby avoided the scrutiny of a separate explanation. AR 349.

The AO identified several other misrepresentations relating to Juliet's ASMPP application, which was submitted in March 2017. AR349. In this application, Juliet identified NAICS code 531120 as its primary NAICS code under the mentor-protégé agreement, and in response to the question, "Have you performed work in the NAICS code in which you're requesting business assistance?," Juliet answered "Yes." AR349. However, the AO found that Juliet had been formed less than six months before submitting its ASMPP application and had only received one federal contract, which was classified under a different NAICS code. AR349. Therefore, the AO concluded that Juliet had not actually performed any work under the NAICS code for which it was requesting business development assistance and to state otherwise was a misrepresentation. AR 349. The AO explained that "Had Juliet truthfully answered 'no' in response to that question, the SBA might have rejected Juliet's application outright or may have requested an additional justification from Juliet that may have resulted in SBA rejecting Juliet's application." *Id.*

The AO also determined that Juliet misrepresented that it was a HUBZone certified firm on its ASMPP application, when in fact it was not. AR350. In addition, Juliet listed 15 NAICS codes in which it claimed it was performing, but the AO found that Juliet had not received any federal contracts and derived zero revenue under those codes. AR350. The AO explained that "By including this false information on its SBA Form 355, Juliet gave the impression that it was an established government contracting business with multiple certifications and multiply revenue streams." AR 350.

The AO found multiple misrepresentations in Juliet's Annual Evaluation Report to the ASMPP submitted in March 2018. *Id.* In particular, on question 2, which asks "How did you find your Mentor?" Juliet responded, "Worked on past projects together." *Id.* The AO determined that this response was misleading and incomplete because "the mentor (PMRG Associates II) is the current employer of the protégé's owner and sole employee" and "Juliet and PMRG Associates had not actually worked on any past projects together." *Id.* Further, in response to the question as to whether there were any changes to the Mentor/Protégé Agreement during the program year, Juliet responded "no." *Id.* However, Juliet and PMRG Associates II had amended their agreement in October 2017. *Id.* Additionally, Juliet stated that PMRG Associates II had provided it with training and other business development assistance, which the AO found to be part of Mr. Suitonu's work as PMRG Associate II's Vice President, rather than distinct mentoring services. AR350–51.

The AO also questioned the accuracy of information submitted in the SBA's size determination. AR351. Specifically, on July 18, 2017, the AO requested the "identity of the owners, officers, and directors of PMRG [Associates II]," to which Juliet never responded. AR351. Instead, Juliet initially replied that Mr. Suitonu "is currently an employee of PM Realty," and in a later follow-up response stated that "Mr. Suitonu remains an employee of PMRG Associates II, LP." *Id.* However, Juliet never responded to the AO's initial question. *Id.*

In addition, Juliet responded to SBA's request for a full description of the corporate structure of PMRG Associates II with an organizational chart that identified two executives who were actually executives of PM Realty Group. AR351. The AO explained that "By suggesting that these two executives were officers of PMRG Associates [II], Juliet gave the impression that Mr. Suitonu was farther down in the corporate structure of PMRG Associates [II] than he really is." AR352.

The AO found that Juliet submitted false or misleading information on multiple occasions and "because of the magnitude of false or misleading information that Juliet has submitted, [the AO] presumes that the disclosure of truthful information would show Juliet to be an other than a small business." AR352. Accordingly, the AO applied the adverse inference rule and concluded that "Juliet is an other-than-small business." *Id.*

In addition, the AO found Juliet and PMRG Associates II to be affiliated entities under the totality of the circumstances based on the following factors: (1) Juliet's sole employee and owner is PMRG Associates II's current Vice President of Construction and Development, (2) Juliet was founded only six months before applying to the ASMPP to be a protégé to PMRG Associates II, (3) Juliet and PMRG Associates II operate in the same industry, (4) Juliet has never received a contract in its industry, (5) PMRG Associates II pays the salary of Juliet's only employee, (6) PMRG Associates II provides office support for Juliet, (7) Juliet's Business Plan states that the key to the startup and long-term viability of Juliet will be the mentor-protégé relationship, and (8) Juliet has certified SDVOSB status through the VA and intends to compete for SDVOSB set-aside awards through joint ventures with PMRG Associates II, a non-SDVOSB large business. AR353–54.

As a result, the AO drew an adverse inference that Juliet was not a small business. AR355.

### F. Appeal to the SBA Office of Hearing and Appeals (OHA)

On September 26, 2018, Juliet appealed the AO decision to the Office of Hearing and Appeals of the Small Business Administration ("OHA"). Compl. at 10. On November 27, 2018, the OHA issued its decision upholding the AO's application of an adverse inference and determination that Juliet was not a small business. AR423–433.

OHA found that "the record supports the [AO's] determination the [Juliet] submitted false or incomplete information to the [AO]." AR430. OHA found that Juliet "did not disclose in its sworn SBA Form 355 that [Juliet's] principal, Mr. Suitonu, currently is employed by [Juliet's] mentor, PMRG Associates [II]." *Id.* OHA also found that Juliet "falsely represented that no owner or officer of [Juliet], such Mr. Suitonu, had ever been employed by an alleged affiliate, such as PMRG Associates [II], and falsely claimed that [Juliet does not share personnel with any alleged affiliate." *Id.* OHA determined that Juliet "was not forthcoming in disclosing Mr. Suitonu's other business interests, including PMRG Mesa, PMRG Surprise, and PMRose." *Id.* OHA concluded that, "[o]n this record, then, the [AO] lacked sufficient information to fully

8

explore the protest allegations or to examine other potential affiliates, thus warranting an adverse inference." *Id.*

OHA explained that Juliet's argument that "its failure to disclose Mr. Suitonu's employment was harmless because [Juliet] acknowledged, in subsequent correspondence, that Mr. Suitonu is employed by PMRG Associates [II]" failed for two reasons. AR430–31. First, "apart from the issue of Mr. Suitonu's employment, [Juliet] also did not fully disclose other relevant information, such as Mr. Suitonu's other business interests." AR431. Second, Juliet disclosed Mr. Suitonu's employment with PMRG Associates II "only after [Juliet] initially claimed that Mr. Suitonu was employed by PM Realty, not PMRG Associates [II], and that Mr. Suitonu had no management role in either company." *Id.* Moreover, OHA explained that Juliet failed to amend its initial SBA Form 355 and its "later admission that Mr. Suitonu is employed by PMRG Associates [II] did not supersede [Juliet's] earlier, sworn representations to the contrary, and those earlier representations cannot be considered harmless." *Id.*

OHA also rejected Juliet's argument that it "in good faith misinterpreted certain questions posed on the SBA Form 355, and that [Juliet] reasonably based its response to the protest on the assumption that [Juliet] could not be affiliated with PMRG Associates [II], [Juliet's] SBA-approved mentor." *Id.* OHA explained that in the underlying protest, the ASMPP director alleged that Juliet is affiliated with PMRG Associates II and Juliet therefore "knew, or should have known, that Mr. Suitonu's employment with PMRG Associates [II] was at issue, and that, in the view of the ASMPP Director, the mentor-protégé agreement was not a complete defense to the affiliation allegations." *Id.* "Moreover, SBA regulations do not require that an adverse inference is appropriate only if the challenged firm acts in deliberate bad faith." Instead, OHA explained, "an adverse inference is justified when a concern, regardless of its subjective intentions, 'submits incomplete information' or 'fail[s] to furnish requested information." *Id.* (quoting 13 C.F.R. §§ 121.1008(d) and 121.1009(d)).

Accordingly, OHA found that the AO "appropriately applied an adverse inference to conclude that [Juliet] is not a small business." *Id.* OHA further explained that "[b]ecause [Juliet] is not a small business, it is unnecessary to decide whether [Juliet] is also affiliated with PMRG Associates [II] through the newly-organized concern rule or the totality of the circumstances." *Id.*

On February 14, 2019, Juliet filed the present suit.

## II.   LEGAL STANDARDS

The Tucker Act, as amended by the Administrative Disputes Resolution Act of 1996, 28 U.S.C. § 1491(b)(1), grants this Court exclusive jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal Agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or proposed procurement." 28 U.S.C. § 1491(b)(1). Under the Tucker Act, an "interested party" includes an actual or prospective offeror

whose direct economic interest would be affected by or which has suffered a non-trivial competitive injury or prejudice as a result of the alleged error. *Sys. Application & Tech., Inc. v. United States*, 691 F.3d 1374, 1382 (Fed. Cir. 2012). If jurisdiction is found, the Court is empowered to grant declaratory and injunctive relief as the Court deems proper pursuant to 28 U.S.C. 1491(b)(2).

Where, as here, the parties have filed motions for judgment upon the administrative record pursuant to Rule 52.1 of the Rules of the Court of Federal Claims (RCFC), the Court must determine whether, "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *Bayfirst Sols., LLC v. United States*, 104 Fed. Cl. 493, 499 (2012) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356–57 (Fed. Cir. 2005)). "The judgment on an administrative record is properly understood as intending to provide for an expedited trial on the record." *Bannum*, 404 F.3d at 1356.

In a bid protest, the Court will set aside an agency procurement decision only where, after reviewing the administrative record, the Court concludes that the agency's decision was "arbitrary, capricious, an abuse of discretion or not otherwise in accordance with law." 5 U.S.C. § 706(2)(A) (cited in 28 U.S.C. § 1491(b)(4)). Application of this standard involves neither judicial fact finding nor review of the agency's factual statements for "substantial evidence." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed. Cir. 2000) (citing *Camp v. Pitts*, 411 U.S. 138, 141–42 (1973)). "The arbitrary and capricious standard applicable [in bid protests] is highly deferential [and] requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Bayfirst Sols.*, 104 Fed. Cl. at 500 (quoting *Advanced Data Concepts*, 216 F.3d at 1058).

In reviewing agency procurement decisions, the Court recognizes that the agency is entitled to a "presumption of regularity," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), and that the Court should not substitute its judgment for that of the agency. *Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 220 (1997); *Cincom Systems, Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997). Under this standard, "the agency's action must be upheld as long as a rational basis is articulated and relevant factors are considered." *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085 (Fed. Cir. 2001) (citations omitted).

In reviewing the OHA administrative law judge's determination, the Court gives those determinations special deference because of the SBA's "quasi-technical administrative expertise and [its] familiarity with the situation acquired by long experience with the intricacies inherent in a comprehensive regulatory scheme." *Ceres Envtl. Servs., Inc. v. United States*, 52 Fed. Cl. 23, 33 (2002) (quoting *Baird Corp. v. United States*, 1 Cl. Ct. 662, 666 (1983)); *see also LB & B Assocs., Inc. v. United States*, 68 Fed. Cl. 765, 771 (2005) (citing *Ceres*, 52 Fed. Cl. at 33); *Eagle Design & Mgmt., Inc. v. United States*, 57 Fed. Cl. 271, 273 (2002) ("At bottom, the court may only reverse the OHA judge's decision if the court finds the decision is irrational or based on an erroneous application of the law.").

### III. DISCUSSION

#### A. OHA Did Not Err in Applying the Adverse Inference Rule

The SBA's adverse inference rule provides:

> If a concern whose size status is at issue fails to submit a completed SBA Form 355, responses to the allegations of the protest, or other requested information within the time allowed by SBA, or if it submits incomplete information, SBA may presume that disclosure of the information required by the form or other missing information would demonstrate that the concern is other than a small business.

13 C.F.R. § 121.1008(d). Additionally, "[i]n the case of refusal or failure to furnish requested information within a required time period, SBA may assume that disclosure would be contrary to the interests of the party failing to make [the] disclosure." 13 C.F.R. § 121.1009(d).

The purpose of the adverse inference rule "is to provide a negative consequence to those who fail to timely respond to a request for information by SBA during the size determination process." *Size Appeal of AudioEye, Inc.*, SBA No. Siz-5477, at 10 (2013). In determining whether an adverse inference was appropriately applied by an AO, OHA applies a three-part test: (1) the requested information must be relevant; (2) there must be a level of connection between the protested concern and the concern about which the information is requested; and (3) the request for information must be specific. *Size Appeal of AWA Business Corp.*, SBA No. Siz-5904, at 3–4 (2018). If these factors are must, a firm must produce the requested information or be subject to the adverse inference. *Size Appeal of Log In Sys., Inc.*, SBA No. Siz-5130, at 2 (2010).

Here, Juliet does not contest the AO's application of the adverse inference rule based on the factors listed above. Instead, Juliet argues OHA improperly applied the adverse inference rule because: (1) Juliet timely submitted a completed SBA Form 355 and responses to information requests;[6] (2) Mr. Suitonu disclosed his employment with PMRG Associates II contemporaneously with the responses to the size protest; (3) Juliet disclosed all information about potential affiliates and Mr. Suitonu was not a partner in the investment firms PMRG Mesa, PMRG Surprise, or PMRose; and (4) Mr. Suitonu misread certain questions on Form 355 and believed he was answering in the context of allegations made by the ASMPP that he was affiliated with PMRG Associates II or PM Realty Group. Pl.'s Mot. at 14–22.

The Court is unpersuaded that OHA improperly applied the adverse inference rule. First, Juliet did not submit a complete SBA Form 355 and its arguments to the contrary are meritless.

---

[6] OHA did not address whether Juliet's responses to the SBA's July 17, 2017 size protest letter were timely. Accordingly, the Court will not address this issue.

11

OHA found myriad omissions and false or misleading information on Juliet's Form 355 submission, including: (1) Juliet's failure to disclose Mr. Suitonu's employment with PMRG Associates II; (2) Juliet's false representation that no owner or officer of Juliet had ever been employed by an affiliate, such as PMRG Associates II; (3) Juliet's false statement that Juliet did not share any personnel with PMRG Associates II; (4) Juliet's failure to disclose Mr. Suitonu's business interests in PMRG Mesa, LLC, PMRG Surprise, LLC, and PMRose 1, LLC;[7] and (5) Juliet's failure to identify the owners, officers, and directors of PMRG Associates II. Due to these omissions and false or misleading statements, the AO was unable "to fully explore the protest allegations or examine other potential affiliates, thus warranting an adverse inference." AR350–52.

Juliet maintains that it disclosed Mr. Suitonu's employment with PMRG Associates II in contemporaneous and subsequent responses to the SBA, and that OHA acted arbitrarily and capriciously in failing to consider the later disclosures. OHA addressed this challenge and rejected it for two reasons. First, "apart from the issue of Mr. Suitonu's employment, [Juliet also did not fully disclose other relevant information, such as Mr. Suitonu's other business interests." AR430–31. "Second, while it is true that [Juliet] later acknowledged that Mr. Suitonu is employed by PMRG Associates [II], this occurred only after [Juliet] initials claimed that Mr. Suitonu was employed by PM Realty. . . and that Mr. Suitonu had no management role in either company." AR431. Moreover, OHA reasoned that because Juliet never submitted an amended Form 355, Juliet's "later admission . . . did not supersede [Juliet's] earlier, sworn representations to the contrary, and those earlier representations cannot be considered harmless." AR431.

OHA's decision in this regard certainly had a rational basis. Juliet failed to include his employment information on its Form 355 and failed submit an amended Form 355. Further, in its subsequent responses to the SBA and in the present suit, Juliet at times claimed that Mr. Suitonu worked for PM Realty Group and at other times, claimed Mr. Suitonu worked for PMRG Associates II. *Compare* AR63 ("PM Realty still employ[s] Mr. Suitonu."), *and* AR340–41 (W-2 Forms listing PM Realty Group as Mr. Suitonu's employer), *with* AR326 ("[Mr. Suitonu] has never worked separately for PMRG/PM Realty"), Compl. at 6 ("At the time of Juliet's formation, Mr. Suitonu remained an employee at PMRG Associates II, LP"). Indeed, in an exhibit attached to its complaint, Juliet submitted Mr. Suitonu's letter of resignation addressed to PM Realty Group, which stated "I am resigning from my position as Vice President of Development & Construction for PM Realty Group . . . This resignation also applies to the companies affiliated with PM Realty Group, PMRG Associates II LP . . . ." Compl., Ex. 3. Accordingly, it is still unclear which entity employed Mr. Suitonu. In any event Juliet's failure to disclose Mr. Suitonu's employment with either of these companies on Form 355 was a material omission.

---

[7] OHA did not address whether Mr. Suitonu was, in fact, a partner at these firms; instead noting only that Juliet "was not forthcoming in disclosing Mr. Suitonu's other business interests." AR430.

12

Further, Juliet's failure to disclose Mr. Suitonu's employment with PMRG Associates II[8] led to additional false or misleading statements. Juliet attributes this to Mr. Suitonu misreading certain questions on Form 355 and his belief that he was answering in the context of allegations made by the ASMPP that he was affiliated with PMRG Associates II or PM Realty Group. Pl.'s Mot. at 16–22. However, OHA also rejected this argument explaining that the underlying protest alleged an affiliation between Juliet and PMRG Associates II and Juliet therefore "knew, or should have known, that Mr. Suitonu's employment with PMRG Associates [II] was at issue." AR431. OHA explained that "SBA regulations do not require that an adverse inference is appropriate only if the challenged firm acts in deliberate bad faith;" instead, "an adverse inference is justified when a concern, regardless of its subjective intentions, 'submits incomplete information' or 'fail[s] to furnish requested information." *Id.* (quoting 13 C.F.R. §§ 121.1008(d) and 121.1009(d)). Ultimately, OHA concluded that "whether intentionally or not, [Juliet] did not submit complete and accurate information to the Area Office. Accordingly, the Area Office appropriately applied an adverse inference that [Juliet] is not a small business." AR431.

In this regard, it cannot be said that OHA's decision lacked a rational basis or was contrary to law. Juliet clearly submitted an incomplete Form 355 laden with false or misleading information, and 13 C.F.R. §§ 121.1008(d) and 121.1009(d) permits the application of an adverse inference when a concern submits incomplete information, "regardless of its subjective intentions." Therefore, the Court holds that OHA's decision to uphold the application of the adverse inference rule was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.[9]

### B. Juliet Has Not Established Bias or Bad Faith by the SBA

Throughout its briefs, Juliet alleges that the SBA was biased or acted in bad faith in reviewing Juliet's various submissions. *See* Pl.'s Mot. at 3 n.3, 14, 15, 16, 19, 20, 24, 27; Pl.'s Resp. at 7, 8, 10–11. According to Juliet, the SBA predetermined that Juliet should be removed from the ASMPP and initiated the size determination in order to justify that removal. *See, e.g.*, Pl.'s Mot. at 2, 3, 14 n.14. Juliet claims that the SBA then focused on minor issues with Juliet's responses, failed to accept Juliet's good faith efforts to determine Mr. Suitonu's employer, failed to communicate or seek clarifications regarding its concerns with Juliet's Form 355 submission, and failed to grant leeway to Juliet's interpretation of SBA's Form 355 and size protest requests for information. *See* Pl.'s Mot. at 3 n.3, 14, 15, 16, 19, 20, 24, 27.

It is well established that Government officials are presumed to act in good faith. *Am-*

---

[8] The Court will assume that Mr. Suitonu was employed by PMRG Associates II for purposes of this decision.

[9] Juliet also challenges the SBA's review of Juliet's ASMPP application and responses on the ASMPP Annual Evaluation Report. *See* Pl.'s Mot. at 23–27. However, as OHA did not address these issues, the Court lacks jurisdiction to hear those challenges now. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

*Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239 (Fed. Cir. 2002); *Croman Corp. v. United States*, 724 F.3d 1357, 1364 (Fed. Cir. 2013) ("Government officials are presumed to act conscientiously in the discharge of their duties."). A party alleging bias must show "either a motivation for the Government employee in question to have acted in bad faith or conduct that is hard to explain absent bad faith." *Inforeliance Corp. v. United States*, 118 Fed. Cl. 744, 747–48 (2014).

In this regard, Juliet has failed to rebut the presumption that the SBA acted in good faith. Apart from conclusory statements alleging bias, Juliet has failed to show any motivation for bad faith or bias by the SBA. Instead, it appears that the SBA was measured and rational throughout Juliet's size determination. Juliet's initial size determination was triggered by a review of the ASMPP Annual Evaluation forms, which indicated a possible affiliation between Juliet and its mentor, PMRG Associates II. *See* AR5–7. In addition, this review found that Juliet falsely claimed to be a HUBZone certified entity, noted issues with the joint ventures Juliet formed, and determined that Mr. Suitonu had submitted the ASMPP Annual Evaluation Reports for Mentors that PMRG Associates II was required to submit. *See* AR6–8. Thereafter, the SBA attempted to investigate Juliet's possible affiliation with PMRG Associates II and three times requested additional information from Juliet. AR59–60, AR325–28, AR331–35, AR336–38. The SBA repeatedly received false or misleading information from Juliet, as explained above, and "because of the magnitude of false or misleading information that Juliet has submitted, [the AO] presume[d] that the disclosure of truthful information would show Juliet to be an other than a small business." AR352.

Accordingly, the record shows that the SBA discharged their duties in good faith and Juliet has failed to convince the Court otherwise.

### C. OHA Did Not Address Whether Juliet and PMRG Associates Were Affiliated

Juliet spends considerable time arguing that the SBA improperly found that Juliet and PMRG Associates II were associated under either the newly-organized concern rule or the totality of the circumstances. *See* Pl.'s Mot. at 27–31; Pl.'s Reply, ECF No. 16, at 9–11, 13. However, because OHA found that Juliet was not a small business based on the application of the adverse inference rule, it determined that it was "unnecessary to decide whether [Juliet] also is affiliated with PMRG Associates [II] through the newly-organized concern rule or the totality of the circumstances." AR431. Therefore, as OHA did not make a determination as to this issue, the Court need not address Juliet's arguments in this regard. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

### D. Juliet's Request for Injunctive and Declaratory Relief is Moot

In its Complaint, Juliet seeks injunctive and declaratory relief: (a) finding the SBA's size determination arbitrary, capricious, and contrary to law; and (b) restoring Juliet to the VIP

Database and in all respects reversing the SBA's adverse size determination, thereby restoring its award eligibility.  Compl. at 1–2, 13–14.  However, because the Court holds that OHA's decision was not arbitrary, capricious, or contrary to law, Juliet's request is denied as moot.

## IV. CONCLUSION

OHA's decision that Juliet was an "other-than-small" business based on the application of the adverse inference rule was not arbitrary, capricious, an abuse of discretion or not otherwise in accordance with law.  Because OHA did not address whether Juliet and PMRG Associates II were affiliated, the Court need not address Juliet's arguments in that regard.  Juliet also failed to establish bad faith or bias by the SBA.  In light of these holdings, Juliet's requests for injunctive and declaratory relief are moot.  Accordingly, the Court hereby **DENIES** Juliet's motion for judgment on the administrative record and **GRANTS** the Government's cross-motion for judgment on the administrative record.  The clerk is directed to enter judgment accordingly.

The parties are directed to file any redactions to this opinion within 7 days.

**IT IS SO ORDERED.**

s/ Edward J. Damich
EDWARD J. DAMICH
Senior Judge
